UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| EDDY MARTEL et al.,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>MEI-GSR Holdings, LLC et al.,<br><br>　　　　　Defendants. | 3:16-cv-00440-RJC-WGC<br><br>**ORDER** |

　　　　　This putative class action arises out of alleged wage-and-hour violations under NRS Chapter 608. Now pending before the Court are Plaintiffs' Motion to Remand (ECF No. 8.) and Defendants' Motion to Dismiss (ECF No. 6). For the reasons given herein, the Court grants the Motion to Remand and denies the Motion to Dismiss as moot.

**I.　　FACTS AND PROCEDURAL HISTORY**

　　　　　Plaintiffs Eddy Martel, Mary Anne Capilla, Janice Jackson-Williams, and Whitney Vaughan (collectively "Plaintiffs") are former non-exempt hourly employees of Defendants HG Staffing, LLC and MEI-GSR Holdings, LLC d/b/a Grand Sierra Resort (collectively "Defendants" or "GSR"). (Compl. ¶¶ 5–13, ECF No. 1-1.) Martel was a Bowling Center Attendant from January 2012 through July 2014; Capilla was a Dealer from March 2011 through September 2013; Jackson-Williams was a Room Attendant from April 2014 through December

2015; and Vaughan was a "Dancing Dealer"—described by Plaintiffs as "part cards dealer, part go-go dancer"—from August 2012 through June 2013. (*Id.* ¶¶ 5–8.)

On June 14, 2016, Plaintiffs filed a class action complaint in Nevada's Second Judicial District Court, alleging Defendants maintained several policies or practices that resulted in off-the-clock work and the underpayment of overtime:

***Off-the Clock Work Due to Time Clock Rounding.*** First, Plaintiffs allege generally that GSR's policy of rounding time clock punches to the nearest quarter-hour prior to calculating payroll is unlawful, in that it "favors the employer and deprives the employees of pay for time they actually perform work activities." (*Id.* at ¶ 16.)

***Off-the-Clock Work Due to Cash Bank Policy.*** In addition, Martel alleges he was required to carry a "cash bank" during his shifts. (*Id.* at ¶¶ 17–19.) Prior to starting his shift, Martel had to retrieve the cash bank from GSR's dispatch cage and then proceed to his workstation. (*Id.*) After his shift ended, he was required to reconcile and return the bank to the same cage. (*Id.*) Martel alleges GSR required these tasks to be done off the clock, and estimates he spent approximately fifteen minutes a day completing them. (*Id.*) Martel also alleges the policy was applicable to "cashiers, bartenders, change persons, slot attendants, retail attendants, and front desk agents." (*Id.*)

***Off-the-Clock Work Due to Dance Class Policy.*** Vaughan alleges that "servetainers" and "dancing dealers" were not compensated for mandatory off-the-clock dance classes, which resulted in roughly two to four hours of uncompensated work time each week. (*Id.* at ¶¶ 20–21.)

***Off-the-Clock Work Due to Pre-Shift Meetings.*** Jackson-Williams alleges that room attendants and housekeepers were required to arrive to work twenty minutes prior to the beginning of each scheduled shift to receive assignments, submit to a uniform inspection, and collect tools and materials necessary to complete their jobs. (*Id.* at ¶¶ 22–23.) Employees were

not compensated for these twenty minutes. (*Id.*) Capilla and Martel also allege that all cocktail waitresses, bartenders, dealers, security guards, technicians, construction workers, and retail attendants had to attend a mandatory pre-shift meeting every workday. (*Id.* at ¶¶ 24–25.) These meetings lasted "ten minutes or more" and were uncompensated. (*Id.*)

*__Off-the-Clock Work Due to Uniform Policy.__* Vaughan alleges that dancing dealers, waitresses, and baristas were required to change into their uniforms on site and off the clock. (*Id.* at ¶¶ 26–28.) Vaughan estimates it took her a total of at least fifteen minutes each workday to change into and out of her uniform. (*Id.*)

*__Underpayment of Overtime Due to "Shift Jamming."__* Lastly, Plaintiffs allege Defendants' "shift-jamming" policy resulted in the underpayment of overtime wages. (*Id.* at ¶¶ 29–37.) This claim is based on Nevada's statutory definition of "workday," which is "a period of 24 consecutive hours which begins when the employee begins work." NRS § 608.0126. According to Plaintiffs, Defendants "routinely" required employees to work eight-hour shifts, and then begin subsequent shifts less than twenty-four hours after the start of the previous shift. (Compl. ¶¶ 29–37.) Plaintiffs' theory is that if an employee works an eight-hour shift on Monday beginning at 9:00 a.m., and then starts another shift on Tuesday at 8:00 a.m., the employee would be entitled to overtime compensation for the first hour of Tuesday's shift under § NRS 608.018 ("An employer shall pay 1-1/2 times an employee's regular wage rate whenever an employee who receives compensation for employment at a rate less than 1-1/2 times the minimum rate prescribed pursuant to NRS 608.250 works . . . [m]ore than 8 hours in any *workday*.") (emphasis added).

On July 25, 2016, Defendants timely removed the action to this Court. (Pet. Removal, ECF No. 1.) Defendants' basis for invoking the Court's jurisdiction is Section 301 of the Labor Management Relations Act of 1947 ("LMRA"). (*Id.* at ¶ 6.) Defendants assert that a valid

collective-bargaining agreement ("CBA") between GSR and certain classes of employees was in effect at times relevant to the Complaint, and argue that Plaintiffs' action arises under or is at least "substantially dependent" on a CBA. (*Id.* at ¶¶ 7–11.) Of the four named plaintiffs in this action, Defendants assert only that Jackson-Williams was ever subject to a CBA, and "readily admit" that Martel and Capilla were not covered by any such agreement. (Resp. 9, ECF No. 10.)

On August 1, 2016, Defendants filed a Motion to Dismiss. (ECF No. 6.) On August 17, 2016, Plaintiffs filed their Motion to Remand. (ECF No. 8.) On August 24, 2016, the Court partially granted a stipulation of the parties to stay proceedings, and stayed briefing on Defendants' Motion to Dismiss pending the Court's determination of the Motion to Remand. (ECF No. 9.)

## II.  LEGAL STANDARDS

Section 301 of the LMRA provides that the United States district courts have original jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees . . . without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). It is now well settled that "the preemptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 23 (1983) (internal quotation marks omitted). Accordingly, any suit for violation of a CBA "is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301." *Id.* Indeed, state-law claims arising under a labor contract are entirely preempted by Section 301, "even in some instances in which the plaintiffs have not alleged a breach of contract in their complaint, if the plaintiffs' claim is either grounded in the provisions of the labor contract or requires interpretation of it." *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1059 (9th Cir. 2007).

The Ninth Circuit, citing Supreme Court precedent, has articulated a two-step analytical framework for determining whether state-law causes of action are preempted by Section 301. *See id.* at 1059–60, citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987) ("Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement."). First, the court must determine "whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA. If the right exists solely as a result of the CBA, then the claim is preempted, and [the] analysis ends there." *Id.* at 1059. To determine whether a right derives from state law or a CBA, the court must consider "the legal character of a claim, as 'independent' of rights under the collective-bargaining agreement [and] not whether a grievance arising from 'precisely the same set of facts' could be pursued." *Id.* at 1060, quoting *Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994).

Second, if the asserted right "exists independently of the CBA," the court must then determine whether the right "is nevertheless substantially dependent on analysis of the collective-bargaining agreement." *Id.* at 1059 (internal quotation marks omitted). This determination is made by considering whether the claim requires the court to "interpret" the CBA. *Id.* at 1060. If so, the claim is preempted. In contrast, if the court need only "look to" the agreement to resolve a state-law claim, there is no preemption. *Id.* (providing examples of situations in which courts may "look to" a CBA without triggering Section 301 preemption).

Furthermore, the Supreme Court has established that a defendant's invocation of a CBA in a defensive argument cannot alone trigger preemption:

> It is true that when a defense to a state claim is based on the terms of a collective-bargaining agreement, the state court will have to interpret that agreement to decide whether the state claim survives. But the presence of a federal question, even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule—*that the plaintiff is the master of the complaint, that a federal question must appear on the face of the*

> *complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court.* . . . [A] defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated. If a defendant could do so, the plaintiff would be master of nothing.

*Caterpillar*, 482 U.S. at 398–99 (emphasis added).

### III.   ANALYSIS

There is, of course, the threshold matter of whether a valid CBA was in effect at times relevant to this action. There are two agreements at issue here: (1) a fully executed agreement with an initial term of June 10, 2009, through December 10, 2010 ("June 2009 CBA"); and (2) an unsigned, undated, redlined draft agreement which Defendants assert is valid and has been in effect "since 2010" ("Redlined Draft CBA"). There are complex issues arising from both agreements.

First, it appears the June 2009 CBA expired by its own terms on or around May 1, 2011. (*See* Reply 6–7, ECF No. 11.) Defendants do not contest this fact. Generally, "[w]hen a complaint alleges a claim based on events occurring after the expiration of a collective bargaining agreement, courts have held that section 301 cannot provide a basis for jurisdiction." *Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 25 (2d Cir. 1988) (collecting cases). However, Plaintiffs allege that Defendants' liability for off-the-clock work dates back to March 31, 2011.[1] By arguing the June 2009 CBA expired in May 2011, Plaintiffs effectively concede that there was a valid CBA in effect during at least the month of April 2011, which does overlap with the alleged period of liability. (*See* Mot. Remand 5, ECF No. 8.)

---

[1] Plaintiffs argue their claims were tolled from June 21, 2013, to January 12, 2016, as a result of another class action complaint asserting the same claims, which was dismissed prior to class certification. (Compl. 8, n. 1, ECF No. 1-1.) Neither this issue nor the related statute of limitations issue is presently before the Court. The Court need not address these issues to rule on the Motion to Remand.

In addition, the Redlined Draft CBA is extremely problematic. Defendants submit the declarations of Larry Montrose, Human Resources Director of MEI-GSR Holdings, and Kent Vaughan, Senior VP of Hotel Operations of MEI-GSR Holdings, wherein both declarants assert that the Redlined Draft CBA has been in effect "from 2010 to present." (Montrose Decl. ¶ 3, ECF No. 10 at 17; Vaughan Decl. ¶ 2, ECF No. 10 at 107.) However, the Redlined Draft CBA is unsigned and undated. (Redlined Draft CBA, ECF No. 10 at 20–93.) It is also clearly a preliminary draft, not in final form. (*Id.*) Moreover, Defendants' names do not appear anywhere on the face of the Redlined Draft CBA; rather, the document indicates that the "Employer" is Worklife Financial, Inc. d/b/a Grand Sierra Resort and Casino ("Worklife"), which was the Employer under the June 2009 CBA and Defendants' apparent predecessor-in-interest. (*Id.*) In support of the Redlined Draft CBA's validity, Defendants argue, correctly, that a CBA need not always be signed to be enforceable. *See Warehousemen's Union Local No. 206 v. Continental Can Co.*, 821 F.2d 1348, 1350 (9th Cir. 1987) ("Union acceptance of an employer's final offer is all that is necessary to create a contract, regardless of whether either party later refuses to sign a written draft."). Moreover, Defendants point to communications from Culinary Workers Union Local 226 ("Union") to Defendants between May 2015 and February 2016, which indicate that the Union was invoking the Redlined Draft CBA to initiate grievance proceedings throughout this timeframe.[2] (Union Letters, ECF No. 10 at 95–97, 99, 105.) *See S. California Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1133 (9th Cir. 2004),

---

2  Specifically, on June 23, 2015, the Union took the position that Defendants had violated "Exhibit 1 and all other pertinent provisions of the Collective Bargaining Agreement." (June 23, 2015 Union Letter, ECF No. 10 at 97.) The alleged violation related to "bringing wages consistent to $15.16 for all Slot Tech I" positions. (*Id.*) The June 2009 CBA includes an Exhibit 1, but it does not address Slot Tech wage rates. (June 2009 CBA at Ex. 1, ECF No. 8-4 at 42.) Rather, the June 2009 CBA covers Slot Tech wages exclusively in Side Letter #1. (*Id.* at Side Letter #1, ECF No. 8-4 at 59.) In contrast, Exhibit 1 in the Redlined Draft CBA includes a Slot Tech Wage Chart. (Redlined Draft CBA at Ex. 1, ECF No. 10 at 93.) Therefore, of the two CBAs provided to the Court, the Union's June 23, 2015 letter can only be referencing the Redlined Draft CBA.

quoting *NLRB v. Haberman Constr. Co.*, 641 F.2d 351, 356 (5th Cir. 1981) (en banc) ("To determine whether a party has adopted a contract by its conduct, the relevant inquiry is whether the party has displayed 'conduct manifesting an intention to abide by the terms of the agreement.'").

The Court need not and will not determine whether either the June 2009 CBA or the Redlined Draft CBA was valid and in effect during times relevant to the Complaint. Because the Motion to Remand may be decided on other grounds, as shown below, the Court declines to wade into the waters of whether and when these contracts may have been in force.

### a. The rights at issue were created by Nevada law and not by a CBA.

Plaintiffs advance three primary legal theories: (1) they were required to work while off the clock, and therefore did not receive compensation of at least minimum wage for all hours worked; (2) they were deprived of overtime when they worked a shift that began within the same statutory "workday" as their previous shift; and (3) Defendants' alleged failure to compensate Plaintiffs pursuant to theories (1) and (2) resulted in a failure to timely pay Plaintiffs all wages due and owing upon termination of employment. All of Plaintiffs' claims arise specifically under Nevada law, independently of any CBA. Plaintiffs' claims are expressly based on NRS 608.016 ("[A]n employer shall pay to the employee wages for each hour the employee works."); Article 15, Section 16 of the Nevada Constitution ("Each employer shall pay a wage to each employee of not less than the hourly rates set forth in this section."); NRS 608.018 ("An employer shall pay 1-1/2 times an employee's regular wage rate whenever an employee who receives compensation for employment at a rate less than 1-1/2 times the minimum [wage] works . . . [m]ore than 8 hours in any workday."); and NRS 608.020–050 ("Whenever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately.").

Therefore, the rights asserted by Plaintiffs—the right to be compensated at minimum wage for all hours worked, the right to overtime compensation, and the right to be paid all wages due and owing at the time of termination—are created by Nevada law, not a CBA. Each right "arises from state law, not from the CBA, and is vested in the employees directly, not through the medium of the CBA." *Burnside*, 491 F.3d at 1064. Moreover, notwithstanding the fact that some of the rights asserted by Plaintiffs may be waived pursuant to a bona fide CBA, they are still conferred upon Plaintiffs by virtue of state law. *See id.* ("[A]s a matter of pure logic, a right that inheres *unless* it is waived exists independently of the document that would include the waiver, were there a waiver.").

### b. Plaintiffs' claims are not substantially dependent on the terms of a CBA.

Having concluded that the rights asserted in Plaintiffs' Complaint inhere in state law, the Court must now consider whether those rights are nonetheless "substantially dependent" on a CBA (i.e., whether resolving Plaintiffs' claims will require interpretation of a CBA). *See id.* at 1060. Defendants have not met their burden to show that the interpretation of a CBA will be required.

First, in arguing that Plaintiffs' claim for failure to pay wages for all hours worked requires interpretation of a CBA, Defendants' focus is NRS 608.012, which defines "wages" as the "amount which an employer agrees to pay an employee for the time the employee has worked . . . ." (Resp. 6, ECF No. 10.) Defendants contend that because NRS Chapter 608 requires only the payment of "wages," and the "wages" of employees governed by the CBA are set by the CBA, all wage claims are "effectively claims for breach of the CBA." (*Id.*) Defendants' conclusion is incorrect. "[N]either looking to the CBA merely to discern that none of its terms is reasonably in dispute, *nor the simple need to refer to bargained-for wage rates in computing a penalty*, is enough to warrant preemption." *Burnside*, 491 F.3d at 1060 (emphasis added) (brackets and citations

omitted), citing *Livadas*, 512 U.S. at 125. With respect to off-the-clock work, Defendants have identified no CBA provision that has any bearing on the issue, much less a relevant provision that is reasonably in dispute. Merely "looking to" a CBA to calculate the amount of unpaid wages does not trigger Section 301 preemption.[3] *See id.* at 1074.

The same reasoning applies to Plaintiffs' constitutional minimum wage claim. Plaintiffs allege they were required to work without pay, and that under the Nevada Constitution these unpaid hours should have been paid at no less than the state minimum wage. Defendants do not argue that the CBA contains any particular provision that must be interpreted in order to resolve this claim. Nor do Defendants contend that the Union waived the right to minimum wages under Article 15, Section 16(B). Indeed, the Redlined Draft CBA contains no such waiver. On the contrary, the wage rate tables in Exhibit 1 all reference a footnote, which reads: "Where these standard rates fall below the applicable minimum wage, the rates have been adjusted accordingly to satisfy Nevada's minimum wage requirements." (Redlined Draft Agreement, Ex. 1, ECF No. 10 at 86–93.) *See Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 692 (9th Cir. 2001), *as amended* (Aug. 27, 2001) ("[A] court may look to the CBA to determine whether it contains a clear and unmistakable waiver of state law rights without triggering § 301 preemption.").

Similarly, Plaintiffs' claim for failure to timely pay wages due and owing upon termination is not preempted. Again, Defendants fail to identify any provision in a CBA that must be interpreted to resolve this claim. Furthermore, the Supreme Court has examined Section 301

---

[3] Defendants also assert that this and other claims in Plaintiffs' Complaint are alleged here improperly, because another court in this District recently granted summary judgment for Defendants in a related case, finding that "except for claims for minimum wage pursuant to NRS 608.250, […] Nevada does not recognize a private statutory cause of action for wages." (Resp. 2, ECF No. 10.) However, the validity of Plaintiffs' claims is not properly before the Court on Plaintiff's Motion to Remand. Indeed, a court must first determine whether it has subject matter jurisdiction to hear a claim before ruling such claim is invalid.

preemption in the context of a closely analogous California statute—Labor Code § 203—and opined:

> The only issue raised by [plaintiff's] claim, whether [defendant] "willfully failed to pay" her wages promptly upon severance, was a question of state law, entirely independent of any understanding embodied in the collective-bargaining agreement between the union and the employer. There is no indication that there was a "dispute" in this case over the amount of the penalty to which [plaintiff] would be entitled, and [*Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988)] makes plain in so many words that when liability is governed by independent state law, the mere need to "look to" the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301.

*Livadas*, 512 U.S. at 124–25 (brackets and citation omitted). The same reasoning applies here, and the Court reaches the same conclusion.

Defendants present a somewhat more persuasive argument that Plaintiffs' overtime claim based on allegations of "shift-jamming" requires interpretation of a CBA. NRS 608.018(3)(e) expressly provides that statutory overtime requirements do not apply to "[e]mployees covered by collective bargaining agreements which provide otherwise for overtime." The Redlined Draft CBA provides for overtime compensation. (Redlined Draft CBA ¶ 9.01, ECF No. 10 at 35.) Therefore, Defendants contend that any employees subject to the CBA waived their statutory right to overtime pay, and any claim for unpaid overtime must arise under the contract. (Resp. 10, ECF No. 10.) Furthermore, Defendants argue that NRS 608.018 requires daily overtime for each "workday," as defined in the statute, while the Redlined Draft CBA requires overtime for each "day," which is undefined and should be given its ordinary meaning. (*Id.* at 12–13.) Therefore, Defendants argue, a court must interpret the CBA to determine the meaning of "day" as the term is used in the CBA. (*Id.*)

The Court declines to reach Defendants' arguments with respect to the alleged shift-jamming policy and the respective meanings of "day" and "workday." Plaintiffs' Complaint

provides: "The claim for unpaid overtime wages pursuant to Defendants' shift jamming policy is *only brought on behalf of employees who are not covered* by a valid and effective collective bargaining agreement." (Compl. ¶ 37, ECF No. 1-1 (emphasis added).) There is no need to interpret a CBA to resolve Plaintiffs' shift-jamming claims because Plaintiffs have specifically pled around any valid CBA that may be applicable. "[T]he plaintiff is the master of the complaint . . . and . . . may, by eschewing claims based on federal law, choose to have the cause heard in state court." *Caterpillar*, 482 U.S. at 398–99.

Lastly, with respect to unpaid overtime on the basis of off-the-clock work, the Court's decision is governed by *Burnside* and *Livadas*. As in those cases, Plaintiffs are not "complaining about the wage rate the employees were paid for certain work, but about the fact that [they were] not paid at all." *Burnside*, 491 F.3d at 1073. The Redlined Draft CBA contains provisions governing the regular rate and the rate of overtime wages. *See id* at 1073–74. However, as in *Burnside* and *Livadas*, "there is no indication in this case of any dispute concerning which wage rate would apply to" off-the-clock hours, *if* such hours are compensable. *See id.* at 1074. Therefore, the conclusion in *Burnside* is directly applicable to Plaintiffs' overtime claim:

> The basic legal issue presented by this case, therefore, can be decided without interpreting the CBA. Depending on how that issue is resolved, damages may have to be calculated, and in the course of that calculation, reference to—but not interpretation of—the CBAs, to determine the appropriate wage rate, would likely be required. Under *Livadas*, this need to consult the CBAs to determine the wage rate to be used in calculating liability cannot, alone, trigger section 301 preemption.

491 F.3d at 1074 (finding overtime claims not preempted where based on allegedly compensable off-the-clock travel time).

Accordingly, all of Plaintiffs' claims can be resolved without interpretation of a CBA. Plaintiffs' claims are not preempted by Section 301, and may not be removed to federal court.

/ / /

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Remand (ECF No. 8) is GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss (ECF No. 6) is DENIED as moot.

IT IS FURTHER ORDERED that the case is REMANDED to the Second Judicial District Court of Washoe County, Nevada, and the Clerk shall close the case.

IT IS SO ORDERED December 6, 2016.

_____
ROBERT C. JONES
United States District Judge